1  COMAR LAW
   D. Inder Comar (SBN 243732)
2     *inder@comarlaw.com*
   901 Mission Street, Suite 105
3  San Francisco, CA 94103
   Telephone: +1.415.640.5856
4  Facsimile: +1.415.513.0445
   *Attorney for Plaintiff*
5

6

7

8             **UNITED STATES DISTRICT COURT**

9            **NORTHERN DISTRICT OF CALIFORNIA**

10

11

12                                    C  **1 3   1 1 2 4**

13  SUNDUS SHAKER SALEH on              CASE NO.
    behalf of herself and those similarly
14  situated,                          **COMPLAINT FOR CONSPIRACY TO**
                                       **COMMIT AGGRESSION; AND THE**
15              Plaintiffs,            **CRIME OF AGGRESSION**

16    vs.                             **DEMAND FOR TRIAL BY JURY**

17  GEORGE W. BUSH, RICHARD B.         CLASS ACTION
    CHENEY, DONALD H.
18  RUMSFELD, CONDOLEEZZA
    RICE, COLIN L. POWELL and
19  PAUL M. WOLFOWITZ,

20              Defendants.

21

22

23

24

25

26

27

28

COMAR LAW              COMPLAINT FOR CONSPIRACY TO COMMIT AGGRESSION;
                            AND THE CRIME OF AGGRESSION

1           SUNDUS SHAKER SALEH (hereinafter "Plaintiff") on behalf of

2 herself and those similarly situated, alleges against Defendants (1) GEORGE W.

3 BUSH, (2) RICHARD B. CHENEY, (3) DONALD H. RUMSFELD, (4)

4 CONDOLEEZZA RICE, (5) COLIN L. POWELL and (6) PAUL WOLFOWITZ

5 (collectively, "Defendants"), as follows:

6                       **NATURE OF THIS ACTION**

7          1.      Defendants GEORGE W. BUSH, RICHARD B. CHENEY,

8 DONALD H. RUMSFELD, CONDOLEEZZA RICE, COLIN L. POWELL, and

9 PAUL WOLFOWITZ broke the law in conspiring and committing the crime of

10 aggression against the people of Iraq.

11          2.      Defendants planned the war against Iraq as early as 1998;

12 manipulated the United States public to support the war by scaring them with

13 images of "mushroom clouds" and conflating the Hussein regime with al-Qaeda;

14 and broke international law by commencing the invasion without proper legal

15 authorization.

16          3.      More than sixty years ago, American prosecutors in

17 Nuremberg, Germany convicted Nazi leaders of the crimes of conspiring and

18 waging wars of aggression. They found the Nazis guilty of planning and waging

19 wars that had no basis in law and which killed millions of innocents.

20          4.      Plaintiff – now a single mother living as a refugee in Jordan –

21 was an innocent civilian victim and of the Iraq War. She seeks justice under the

22 Nuremberg principles and United States law for the damages she and others like

23 her suffered because of Defendants' premeditated plan to invade Iraq.

24                      **JURISDICTION AND VENUE**

25          5.      This Court has subject matter jurisdiction over the claims and

26 causes of action described herein pursuant to 28 U.S.C. § 1350.

27          6.      Venue is proper in the Northern District of California because

28 Defendant RICE is subject to personal jurisdiction in this district, and the

1 allegations described in this Complaint did not take place in any one judicial
2 district. 28 U.S.C. § 1391(b)(3).

3        7.    Personal jurisdiction over Defendants is proper in this Court
4 because Defendants are within the jurisdiction of this Court.

5                  **THE PARTIES**

6        8.    Plaintiff Sundus Shaker Saleh is a citizen of Iraq and resides in
7 Amman, Jordan. She lived in Iraq at the inception of the Iraq War in 2003, lost her
8 home and her property, and was forced to flee to Jordan in 2005 because of the
9 lack of security caused by the war and the occupation that followed. She is
10 currently supporting four dependents by herself in Jordan.

11        9.    Defendant George W. Bush ("BUSH") was the 43rd President
12 of the United States from 2001 and 2009. Defendant BUSH, under his authority as
13 Commander-in-Chief of the United States armed forces, gave the order to invade
14 Iraq on March 19, 2003. In so ordering the invasion, and as further described in
15 this Complaint, Defendant BUSH joined the conspiracy initiated by Defendants
16 CHENEY, RUMSFELD and WOLFOWITZ to use the United States armed forces
17 to commit the crime of aggression against the people of Iraq. Upon information
18 and belief, Defendant BUSH is a resident of Dallas, Texas.

19       10.    Defendant Richard B. Cheney ("CHENEY") was the 46th Vice
20 President of the United States from 2001 to 2009, under Defendant Bush. As
21 further described in this Complaint, Defendant Cheney participated in a conspiracy
22 in the late 1990s with Defendants RUMSFELD and WOLFOWITZ to use the
23 United States armed forces to commit the crime of aggression against the people of
24 Iraq. Upon information and belief, Defendant CHENEY is a resident of Wilson,
25 Wyoming.

26       11.    Defendant Donald H. Rumsfeld ("RUMSFELD") was the 21st
27 Secretary of Defense of the United States from 2001 to 2006, under Defendant
28 BUSH. As further described in this Complaint, Defendant Rumsfeld participated in

2

1 | a conspiracy in the late 1990s with Defendants CHENEY and WOLFOWITZ to
2 | use the United States armed forces to commit the crime of aggression against the
3 | people of Iraq. Upon information and belief, Defendant RUMSFELD is a resident
4 | of Washington DC.

5 | 12. Defendant Condoleezza Rice ("RICE") was the 20th United
6 | States National Security Advisor from 2001 to 2005, under Defendant BUSH. As
7 | further described in this Complaint, Defendant RICE joined the conspiracy to
8 | invade Iraq at least in August 2002, when she joined and participated in the "White
9 | House Iraq Group," a group established by the White House in August 2002 for the
10 | sole purpose of convincing the American public that the United States had to
11 | invade Iraq. Upon information and belief, Defendant RICE is a resident of
12 | Stanford, California.

13 | 13. Defendant Paul Wolfowitz ("WOLFOWITZ") was the 25th
14 | Deputy Secretary of Defense from 2001 to 2005, under Defendant BUSH. As
15 | further described in this Complaint, Defendant WOLFOWITZ was the prime
16 | architect of the Iraq War and initiated a conspiracy in the late 1990s with
17 | Defendants CHENEY and RUMSFELD to use the United States armed forces to
18 | commit the crime of aggression against the people of Iraq. Upon information and
19 | belief, Defendant WOLFOWITZ is a resident of Washington DC.

20 | **NUREMBERG OUTLAWED THE CRIME OF AGGRESSION:**
21 | **THE "SUPREME INTERNATIONAL CRIME"**

22 | 14. At the end of World War II, the United States and its allies put
23 | Nazi leaders on trial for their crimes, including crimes against humanity and war
24 | crimes. But the chief crime prosecuted against the Nazis was the **crime of**
25 | **aggression**: engaging in a premeditated war without lawful reason.

26 | 15. Count One of the Nuremberg indictment charged Nazi leaders
27 | with a "Common Plan or Conspiracy" to engage in "Crimes against Peace, in that
28 | the defendants planned, prepared, initiated wars of aggression, which were also

3

1  wars in violation of international treaties, agreements, or assurances."[1]

2      16.    In his opening statement to the Tribunal, Chief Counsel for the
3  United States Robert H. Jackson stated "This Tribunal . . . represents the practical
4  effort of four of the most mighty of nations, with the support of 17 more, to utilize
5  international law to meet the greatest menace of our times – aggressive war."[2]

6      17.    Chief Prosecutor Jackson argued, "The Charter of this Tribunal
7  evidences a faith that the law is not only to govern the conduct of little men, but
8  that even rulers are, as Lord Chief Justice Coke put it to King James, '**under God**
9  **and the law**.'" (*Id.*) (emphasis added).

10      18.    Chief Prosecutor Jackson argued, "Any resort to war – to any
11  kind of a war – **is a resort to means that are inherently criminal**. War inevitably
12  is a course of killings, assaults, deprivations of liberty, and destruction of
13  property." (Emphasis added).

14      19.    He continued, "The very minimum legal consequence of the
15  treaties making aggressive wars illegal is to **strip those who incite or wage them**
16  **of every defense the law ever gave, and to leave war-makers subject to**
17  **judgment by the usually accepted principles of the law of crimes**." (*Id.*)
18  (emphasis added).

19      20.    Chief Prosecutor Jackson recognized that the crime of
20  aggression applied to the United States. He argued, "We must never forget that the
21  record on which we judge these defendants today is the record on which history
22  will judge us tomorrow. To pass these defendants a poisoned chalice is to put it to
23  our own lips as well." (*Id.*)

24      21.    The International Military Tribunal at Nuremberg found Nazi
25  leaders guilty of the crimes of conspiracy to engage in a war of aggression and the

26  ---
[1] *See* http://avalon.law.yale.edu/imt/count1.asp.
27 [2] http://www.roberthjackson.org/the-man/speeches-articles/speeches/speeches-
28  by-robert-h-jackson/opening-statement-before-the-international-military-tribunal/

1  crime of aggression.[3] The Tribunal stated, "The charges in the Indictment that the
2  defendants planned and waged aggressive wars are charges of the utmost gravity.
3  **War is essentially an evil thing**. Its consequences are not confined to the
4  belligerent states alone, but affect the whole world." (Emphasis added).

5       22.    The Tribunal held, "To initiate a war of aggression, therefore, is
6  not only an international crime; it is the **supreme international crime** differing
7  only from other war crimes in that it contains within itself the accumulated evil of
8  the whole." (Emphasis added).

9       23.    The Tribunal rejected the defendants' argument that Adolph
10  Hitler was solely to blame for the acts of aggression. "**[T]hose who execute the**
11  **plan do not avoid responsibility by showing that they acted under the**
12  **direction of the man who conceived it**. Hitler could not make aggressive war by
13  himself." (Emphasis added).

14       24.    High-ranking Nazis, including Hermann Göring, Alfred Jodl
15  and Wilhelm Keitel were sentenced to death for their crimes.

16  **THE PROJECT FOR THE NEW AMERICAN CENTURY**

17       25.    In 1997, William Kristol and Robert Kagan formed a think tank
18  in Washington DC called "The Project for the New American Century," or
19  "PNAC." PNAC included as members Defendants CHENEY, RUMSFELD and
20  WOLFOWITZ.

21       26.    On January 26, 1998, Defendants RUMSFELD and
22  WOLFOWITZ signed a letter[4] to then President William J. Clinton, requesting that
23  the United States implement a "**strategy for removing Saddam's regime from**
24  **power**," which included a "willingness to undertake military action as diplomacy
25  is clearly failing." Removing Saddam from power had to "become the aim of
26  American foreign policy." (Emphasis added).

27    [3]  http://werle.rewi.hu-berlin.de/IMTJudgment.pdf
28    [4]  http://www.newamericancentury.org/iraqclintonletter.htm

5

1    27.    From 1997 to 2000, PNAC produced several documents
2  advocating the military overthrow of Saddam Hussein.[5]

3    28.    On May 29, 1998,[6] Defendants RUMSFELD and
4  WOLFOWITZ signed a letter to then Speaker of the House Newt Gingrich and
5  Senate Majority Leader Trent Lott in which they advocated that "U.S. policy
6  should have as its explicit goal removing Saddam Hussein's regime from power
7  and establishing a peaceful and democratic Iraq in its place," which included the
8  use of "U.S. and allied military power . . . to help remove Saddam from power."

9    29.    On September 18, 1998,[7] Defendant WOLFOWITZ gave
10  testimony before the House National Security Committee on Iraq in which he
11  stated that the United States had to "liberat[e] the Iraqi people from Saddam's
12  tyrannical grasp and free Iraq's neighbors from Saddam's murderous threats."
13  Defendant WOLFOWITZ advocated that the United States establish a "safe
14  protected zone in the South" and form a provisional government that would
15  **"control the largest oil field in Iraq."** (Emphasis added).

16    30.    Through PNAC, Defendants CHENEY, RUMSFELD and
17  WOLFOWITZ advocated for the military overthrow of Saddam Hussein and the
18  invasion of Iraq.

19  **ONCE IN POWER, DEFENDANTS USE 9/11 AS COVER TO PLAN THEIR**
20  **AGGRESSIVE WAR AGAINST IRAQ**

21    31.    In January 2001, Defendant BUSH was sworn in as 43rd
22  President of the United States. Defendant CHENEY was Defendant BUSH's Vice
23  President. Defendant BUSH appointed Defendants RUMSFELD, WOLFOWITZ,
24  RICE and POWELL to high-ranking positions within his administration.

25    32.    On September 11, 2001, Saudi Arabian terrorists with links to

26  ———————————————————————
27  [5]  http://www.newamericancentury.org/iraqmiddleeast2000-1997.htm
     [6]  http://www.newamericancentury.org/iraqletter1998.htm
28  [7]  http://www.newamericancentury.org/iraqsep1898.htm

6

1  an Afghan-based group called "al-Qaeda," and headed by Osama bin Laden,

2  hijacked four planes and committed terrorist acts against the American people.

3        33.    According to British journalist John Kampfner,[8] the day of the

4  9/11 attacks, Defendants WOLFOWITZ and RUMSFELD openly pushed for war

5  against Iraq – despite the fact that the 9/11 hijackers were Saudi Arabian and had

6  been based out of Afghanistan. Defendant RUMSFELD asked, "Why shouldn't we

7  go against Iraq, not just al-Qaeda?" with Defendant WOLFOWITZ adding that

8  Iraq was a "brittle, oppressive regime that might break easily—it was doable."

9        34.    Kampfner writes, "from that moment on, he and Wolfowitz

10 used every available opportunity to press the case."

11        35.    According to Richard A. Clarke,[9] the former National

12 Coordinator for Security, Infrastructure Protection and Counter-terrorism (and who

13 worked for Presidents George H.W. Bush and William Clinton) Defendants

14 WOLFOWITZ, RUMSFELD and BUSH sought to use 9/11 as an excuse to attack

15 Iraq.

16        36.    On Wednesday, September 12, 2001, the day after 9/11,

17 Richard A. Clarke heard Defendant RUMSFELD state that the United States had to

18 broaden its objectives by "getting Iraq."[10] Defendant POWELL pushed back,

19 urging a focus on al-Qaeda. Richard A. Clarke stated, "Having been attacked by al-

20 Qaeda, for us now to go bombing Iraq in response would be like our invading

21 Mexico after the Japanese attacked us at Pearl Harbor."

22        37.    Later in the day, Richard A. Clarke heard Defendant

23 RUMSFELD complain that there were no decent targets for bombing in

24 Afghanistan and that the United States military should consider bombing Iraq,

25

26 [8] Jonathan Kampfner, *Blair's Wars* (Simon and Schuster 2003).

27 [9] This information is lifted from press articles and Richard A. Clarke, *Against All Enemies – Inside America's War On Terror* (Free Press 2004).

28 [10] http://www.nytimes.com/2004/03/28/books/chapters/0328-1st-clarke.html?pagewanted=all

7

1  which, he said, had better targets. At first Richard A. Clarke thought Rumsfeld was

2  joking. But he was serious, and Defendant BUSH did not reject out of hand the

3  idea of attacking Iraq. Instead, Defendant BUSH noted that what the United States

4  needed to do with Iraq was to change the government, not just hit it with more

5  cruise missiles, as Defendant RUMSFELD had implied.

6        38.    On September 12, 2001, the day after the 9/11 attacks,

7  Defendant BUSH approached Richard A. Clarke and a few other people and stated,

8  "I know you have a lot to do and all, but I want you, as soon as you can, to go back

9  over everything, everything. See if Saddam did this. See if he's linked in any way."

10  Richard A. Clarke was again incredulous. He responded, "But, Mr. President, Al

11  Qaeda did this." Defendant BUSH responded, "I know, I know, but - see if

12  Saddam was involved. Just look. I want to know any shred-" "Absolutely, we will

13  look-again," Richard A. Clarke answered. "But you know, we have looked several

14  times for state sponsorship of Al Qaeda and not found any real linkages to Iraq.

15  Iran plays a little, as does Pakistan, and Saudi Arabia, Yemen." "Look into Iraq,

16  Saddam," Defendant BUSH responded.

17        39.    According to Richard A. Clarke, the Bush Administration had

18  been focused on Iraq **prior** to the attacks of 9/11: so focused that **they failed to**

19  **listen to warnings** that al-Qaeda-linked terrorists were planning a spectacular

20  attack.

21        40.    For example, on January 25, 2001, four days after Defendant

22  BUSH was inaugurated, Richard A. Clarke wrote to Defendant RICE and asked for

23  a cabinet-level meeting to discuss the threat posed by al-Qaeda and suggesting how

24  the United States should respond.[11]

25        41.    Defendant RICE downgraded Richard A. Clarke's position so

26  that he no longer had direct access to the president, a privilege he had enjoyed

27

28  [11]  http://www.gwu.edu/~nsarchiv/NSAEBB/NSAEBB147/index.htm

1    under President Clinton.

2          42.    In April 2001, Richard A. Clarke met with Defendant

3    WOLFOWITZ to discuss the threat posed by al-Qaeda. Defendant WOLFOWITZ

4    responded, "I just don't understand why we are beginning by talking about this one

5    man bin Laden." He told Richard A. Clarke, "You give bin Laden too much credit.

6    He could not do all these things like the 1993 attack on New York, not without a

7    state sponsor. Just because FBI and CIA have failed to find the linkages does not

8    mean they don't exist."[12]

9          43.    Defendant WOLFOWITZ was repeating a discredited theory

10    that Iraq had been behind the 1993 attack, which was not true.

11          44.    On August 6, 2001, Defendant BUSH received a briefing from

12    the CIA entitled, "Bin Ladin [sic] Determined To Strike US."[13]

13          45.    Defendants were on notice of an attack against the United

14    States by al-Qaeda but failed to listen to warnings of an attack because they were

15    too focused on looking for ways to attack Iraq.

16    **IN JULY 2002, THE BRITISH GOVERNMENT LEARNS THAT**

17    **DEFENDANTS PLAN TO INVADE IRAQ AND "FIX" INTELLIGENCE**

18    **AROUND THE INVASION**

19          46.    In July 2002, high-ranking British politicians, including Prime

20    Minister Tony Blair, Foreign Secretary Jack Straw and Attorney General Lord

21    Goldsmith met to discuss intelligence on Iraq. This meeting was memorialized in a

22    secret memorandum that has since been leaked.[14] During that meeting, head of

23    Secret Intelligence Service Sir Richard Dearlove reported on his recent meetings in

24    the United States. He stated, "There was a perceptible shift in attitude. Military

25    _____

26    [12] http://www.cbsnews.com/8301-18560_162-607774.html

      [13] http://www.gwu.edu/~nsarchiv/NSAEBB/NSAEBB116/index.htm

27    [14] This memo has been labeled the "Downing Street Memo" in the United

28    Kingdom. http://www.gwu.edu/~nsarchiv/NSAEBB/NSAEBB328/II-Doc14.pdf

9

1 action was now seen as inevitable. Bush wanted to remove Saddam, through
2 military action, justified by the conjunction of terrorism and WMD. **But the**
3 **intelligence and facts were being fixed around the policy**." (Emphasis added).

4     47.    The meeting went on to discuss likely American military
5 options, including a "slow build-up of 250,000 US troops, a short (72 hour) air
6 campaign, then a move up to Baghdad from the south."

7     48.    Foreign Secretary Jack Straw stated that it seemed clear that
8 Defendant BUSH had "made up his mind" to take military action, even if the
9 timing was not yet decided. Foreign Secretary Straw noted, "But the case was thin.
10 Saddam was not threatening his neighbours, and his WMD capability was less than
11 that of Libya, North Korea or Iran."

12     49.    The Attorney General of the United Kingdom affirmed that
13 there was no legal justification for the war. "[T]he desire for regime change was
14 not a legal base for military action. There were three possible legal bases: self-
15 defence, humanitarian intervention, or UN [Security Counsel] authorisation. The
16 first and second could not be the base in this case. Relying on UNSCR 1205 of
17 three years ago would be difficult. The situation might of course change."

18 **DEFENDANTS EXECUTE A PLAN TO SCARE THE AMERICAN PUBLIC**
19 **SO THAT THEY CAN INVADE IRAQ**

20     50.    In August 2002, the White House established a group called the
21 White House Iraq Group ("WHIG"), the purpose of which was to convince the
22 American public into supporting a war against Iraq. Defendant RICE was a
23 member of WHIG, along with Karl Rove, I. Lewis ("Scooter") Libby, and other
24 high-ranking Bush Administration officials.

25     51.    At a September 5, 2002 WHIG meeting, the term "smoking
26 gun/mushroom cloud" was unveiled related to the supposed nuclear dangers posed
27 by Saddam Hussein. According to Newsweek columnist Michael Isikoff, "The
28 original plan had been to place it in an upcoming presidential speech, but WHIG

10

1  members fancied it so much that when the *Times* reporters contacted the White
2  House to talk about their upcoming piece [about aluminum tubes], one of them
3  leaked Gerson's phrase – and the administration would soon make maximum use
4  of it."[15]

5      52.    On September 7, 2002 unnamed White House officials told the
6  New York Times[16] that the Bush Administration was unveiling this strategy to
7  "persuade the public, the Congress and the allies of the need to confront the threat
8  from Saddam Hussein."

9      53.    The New York Times also reported that White House Chief of
10  Staff Andrew Card, Jr., explained that the Bush Administration waited until after
11  Labor Day to begin this push because "From a marketing point of view you don't
12  introduce new products in August."

13      54.    The New York Times reported that the centerpiece of the
14  strategy would be to use Mr. Bush's "speech on September 11 to help move
15  Americans towards support of action against Iraq, which could come early next
16  year."

17      55.    An August 10, 2003 article in the Washington Post confirmed
18  that during this period from September 2002 to the initiation of the war,
19  Defendants engaged in a "pattern" of "depicting Iraq's nuclear weapons program
20  as more active, more certain and more imminent in its threat than the data they had
21  would support."[17]

22      56.    On September 8, 2002, Defendant RICE told CNN's Late
23  Edition that Saddam Hussein was "actively pursuing a nuclear weapon." "There

24

25  [15] Michael Isikoff and David Corn, Hubris: The Inside Story of Spin, Scandal, and the Selling of the Iraq War (Crown Publishers, New York, September 8, 2006),
26  p. 35.
   [16] http://www.nytimes.com/2002/09/07/us/traces-of-terror-the-strategy-bush-
27  aides-set-strategy-to-sell-policy-on-iraq.html
   [17] http://www.washingtonpost.com/wp-
28  dyn/content/article/2006/06/12/AR2006061200932.html

11

1 will always be some uncertainty about how quickly he can acquire nuclear
2 weapons but we don't want the smoking gun to be a mushroom cloud."

3      57.   In 2008,[18] former Bush aide and press secretary Scott
4 McClellan would write that Defendants engaged in a "political propaganda
5 campaign" aimed at "manipulating sources of public opinion."

6 **DEFENDANTS FALSELY LINK AL-QAEDA TO IRAQ**

7      58.   Despite the fact that there has never been any proof of any
8 operational cooperation between al-Qaeda and Iraq, Defendants engaged in a
9 pattern and practice of deceiving the American public into believing that such a
10 link existed, in order to win public approval for the crime of aggression against
11 Iraq.

12      59.   On October 7, 2002, Defendant BUSH told the American
13 Public that "Iraq and al Qaeda have had high-level contacts that go back a decade.
14 Some al Qaeda leaders who fled Afghanistan went to Iraq. These include one very
15 senior al Qaeda leader who received medical treatment in Baghdad this year, and
16 who have been associated with planning for chemical and biological attacks.
17 We've learned that Iraq has trained as Qaeda members in bomb-making and
18 poisons and deadly gases. And we know that after September the 11th, Saddam
19 Hussein's regime gleefully celebrated the terrorist attacks on America."[19]

20      60.   In this same speech, Defendant BUSH claimed that Saddam
21 Hussein had a group of "nuclear mujahaideen – his nuclear holy warriors."

22      61.   On October 14, 2002, Defendant BUSH stated that Saddam
23 Hussein "has had connections with al Qaeda. This is a man who, in my judgment,

24

25

26
_____

[18] http://www.washingtonpost.com/wp-
27 dyn/content/article/2008/05/27/AR2008052703679.html

[19] http://georgewbush-whitehouse.archives.gov/news/releases/2002/10/20021007-
28 8.html

12

1 would like to use al Qaeda as a forward army."[20]

2       62.    Defendant BUSH made these statements despite the fact that

3 ten days after the 9/11 attacks, he was told in his daily brief ("PDB") from the CIA

4 that there was no evidence linking Iraq to 9/11 and scant evidence that Iraq had any

5 collaborative ties with al Qaeda.[21]

6       63.    A Defense Intelligence Agency document from February 2002

7 confirmed that the source of the intelligence linking Iraq to al Qaeda was a likely

8 fabricator and "intentionally misleading" his interrogators.[22] The report concluded,

9 "Saddam's regime is intensely secular and is wary of Islamic revolutionary

10 movements. Moreover, Baghdad is unlikely to provide assistance to a group it

11 cannot control."

12       64.    On December 9, 2001,[23] Defendant CHENEY alleged that an

13 Iraqi intelligence officer met with one of the 9/11 hijackers (Mohammed Atta) in

14 the Czech Republic. He repeated this allegation again in September 2003.[24]

15       65.    No such meeting took place, and in 2006, Defendant CHENEY

16 retracted this statement.[25]

17       66.    In February 2003, Defendant POWELL gave a speech to the

18 United Nations Security Council on the issue of Iraq, considered critical to winning

19 approval for military action. In that speech, Defendant POWELL stated[26] that Iraq

20

21 [20] http://georgewbush-whitehouse.archives.gov/news/releases/2002/10/20021014-
22 3.html

22 [21] http://www.nationaljournal.com/whitehouse/key-bush-intelligence-briefing-
23 kept-from-hill-panel-20051122

24 [22]http://www.nytimes.com/2005/11/06/politics/06intel.ready.html?pagewanted=all
&_r=0

25 [23] http://georgewbush-whitehouse.archives.gov/vicepresident/news-
speeches/speeches/print/vp20011209.html

26 [24] http://www.nbcnews.com/id/3080244/default.htm#.UTPUdRms1JM

27 [25] http://georgewbush-whitehouse.archives.gov/news/releases/2006/03/20060329-
2.html

28 [26] http://www.guardian.co.uk/world/2003/feb/05/iraq.usa3

     COMPLAINT FOR CONSPIRACY TO COMMIT AGGRESSION;
AND THE CRIME OF AGGRESSION

1 "harbors a deadly terrorist network headed by Abu Musab Al-Zarqawi, an
2 associated collaborator of Osama bin Laden and his al-Qaeda lieutenants." He
3 stated that Saddam Hussein was "more willing to assist al-Qaida after the 1998
4 bombings of [US] embassies in Kenya and Tanzania." He alleged that, "From the
5 late 1990s until 2001, the Iraqi Embassy in Pakistan played the role of liaison to
6 the Al Qaeda organization."

7     67.    In a 2005 interview with ABC News, Defendant POWELL
8 admitted he felt "terrible" about this speech and considered it a "blot" on his
9 record.[27]

10     68.    When asked about a specific Iraq and al-Qaeda connection,
11 Defendant POWELL admitted, "I have never seen a connection . . . I can't think
12 otherwise because I'd never seen evidence to suggest there was one." Defendant
13 POWELL thus admitted that the allegations given in his speech were untrue.

14 ## DEFENDANTS COMMIT THE CRIME OF AGGRESSION
15 ## AGAINST IRAQ

16     69.    On March 19, 2003, the United States, upon the order of
17 Defendant BUSH and in coordination with other Defendants, invaded Iraq.

18     70.    Defendants failed to secure United Nations authorization for the
19 war. Article 39 of the United Nations Charter requires the United Nations Security
20 Council to "determine the existence of any threat to the peace, breach of the peace,
21 or act of aggression and shall make recommendations, or decide what measures
22 shall be taken in accordance with Articles 41 and 42 to maintain or restore
23 international peace and security."

24     71.    No such determination was ever or has ever been made by the
25 United Nations Security Council.

26     72.    On March 19, 2003, there was no imminent humanitarian

27

28 [27] http://www.guardian.co.uk/world/2003/feb/05/iraq.usa3

14

    COMPLAINT FOR CONSPIRACY TO COMMIT AGGRESSION;
AND THE CRIME OF AGGRESSION

1 disaster or event in Iraq requiring the intervention of a foreign power.

2      73.    On March 19, 2003, Iraq did not pose an imminent military

3 threat requiring the use of the American military in self-defense.

4      74.    Even had Iraq posed an imminent military threat on March 19,

5 2003 (which it did not), the invasion of Iraq was not reasonably related or

6 proportionate to the threat posed.

7      75.    On September 14, 2004, United Nations Secretary General Kofi

8 Annan stated,[28] "I have indicated it was not in conformity with the UN charter.

9 From our point of view and from the charter point of view it was illegal."

10      76.    By invading Iraq, Defendants committed the crime of

11 aggression.

12               **PLAINTIFF IS INJURED AS A RESULT OF THE WAR**

13      77.    In 2003, lived in Jalawla, Iraq. She used to teach and work in

14 private galleries. She and her family also had a jewelry store. Plaintiff lived with

15 her husband (from whom she is now divorced) and four children.

16      78.    In 2003, the Kurdish Army allied with the United States forced

17 Plaintiff to leave her home in Jalawla. Masked troops came and threatened Plaintiff

18 and her family, telling Plaintiff she would be killed if they did not leave the house.

19      79.    Plaintiff was not able to take anything from her house except

20 for some clothes.

21      80.    Plaintiff moved to Baghdad, where she found employment

22 working for the independent committee for elections.

23      81.    In 2005, while in Baghdad, Plaintiff was repeatedly threatened

24 by Shia Muslims over a period of four to five months. Plaintiff is Sabean Mandean,

25 and is considered an "infidel" by some Muslim groups in Iraq.

26      82.    In 2005, Plaintiff went to the police for protection. The police

27

28 [28] http://www.guardian.co.uk/world/2004/sep/16/iraq.iraq

15

1 refused to help her because they told her they could not even protect themselves.

2 83. One day in 2005, as Plaintiff was going home, a group of Shia

3 Muslims tried to kill her by ramming their car into hers on the road.

4 84. After this attempt, Plaintiff and her family moved in with

5 relatives, where they stayed for 10 days. On the tenth day, Shia Muslims found

6 them again and fired ammunition at them in their home. No one was injured.

7 85. Following this attack, Plaintiff fled Iraq to Jordan, where she

8 lives today.

9 86. Defendants are the "but-for" and proximate cause of Plaintiff's

10 damages. By launching an illegal war of aggression, Defendants produced the

11 chaos that enveloped Iraq and which led to Plaintiff losing her home, being

12 threatened for her religion, and being forced to flee and live as a refugee in Jordan.

13 ## CLASS ACTION ALLEGATIONS

14 ### Definition of the Plaintiff Class

15 87. Pursuant to Federal Rule of Civil Procedure 23(a), Plaintiff

16 brings this action for herself and on behalf of a class of persons consisting of all

17 innocent Iraqi civilians who, through no fault of their own, suffered damage as a

18 but-for and proximate cause of Defendants' international legal torts, specifically

19 (1) their conspiracy to commit the crime of aggression and (2) the crime of

20 aggression itself. Plaintiff requests certification pursuant to Federal Rule of Civil

21 Procedure 23(b)(3) (hereinafter referred to as the "**Iraq Civilian Victims' Class**")

22 88. The Iraq Civilian Victims' Class, as defined herein, includes all

23 Iraqi civilians (i.e. non-combatants) who were damaged by the Iraq War.

24 89. Plaintiff and members of the Iraq Civilian Victims' Class may

25 also seek to amend this complaint further in order to establish subclasses including,

26 but not limited to, one or more of the following:

27 a. A subclass of Iraqi civilian victims who were subject to

28 torture or other war crimes;

16

1    b.    A subclass of Iraqi civilian victims who were forced to
2 flee Iraq and are now refuges in other countries;

3    c.    A subclass of Iraqi civilian victims who sustained
4 property damage and/or property loss;

5    d.    A subclass of Iraq civilian victims who sustained only
6 emotional harm, such as pain and suffering as defined by law;

7    e.    Any additional subclass or subclasses of Iraqi civilian
8 victims who have suffered injuries necessitating compensatory damages, to be
9 determined at a later stage in these proceedings.

10                    **Rule 23(a) Prerequisites**

11    90.    The prerequisites to a class action under Rule 23(a) of the
12 Federal Rules of Civil Procedure exist:

13    a.    **Numerosity:** The members of the Iraq Civilian Victims'
14 Class are so numerous that joinder of all class members is impracticable. While the
15 exact number of Iraqi victims is unknown to the Representative Plaintiff at this
16 time, it is likely that hundreds of thousands or even millions of Iraqis may have
17 been subject to damages as a result of Defendants' actions, and would have
18 standing to pursue such claims under 28 U.S.C. § 1350.

19    b.    **Commonality:** Common questions of law and fact exist
20 as to all members of the Iraq Civilian Victims' Class and predominate over
21 questions affecting individual members of the Iraq Civilian Victims' Class
22 Questions of law and fact common to the Iraq Civilian Victims' Class include, but
23 are not limited to, the following:

24    (1)    Whether the actions of Defendants constituted a
25 conspiracy to engage in a war of aggression, and whether that conspiracy was the
26 cause of damages to Iraqi civilians;

27    (2)    Whether the actions of Defendants constituted a
28 war of aggression, and whether that war of aggression was the cause of damages to

17

1  Iraq civilians.

2          c.    **Typicality:**  The claims of the Representative Plaintiff is

3  typical of the claims of all members of the Iraq Civilian Victims' Class because all

4  members of the proposed class share the common characteristic of being civilian

5  non-combatants who did not take up arms and who were damaged as a result of

6  Defendant's conspiracy and waging of aggressive war, as complained herein.

7          d.    **Adequacy of Representation:**  The Representative

8  Plaintiff will fairly and adequately protect the interests of the Iraq Civilian

9  Victims' Class and is represented by counsel competent and experienced in

10  litigation. The Representative Plaintiff is a member of the Iraq Civilian Victims'

11  Class with claims typical of the claims of all class members.  The Representative

12  Plaintiff does not have interests that are antagonistic to or in conflict with those

13  persons whom the Representative Plaintiff seeks to represent.

14                        <u>**COUNT I**</u>

15      **(Conspiracy To Commit the Crime of Aggression Against All Defendants)**

16          91.    Plaintiff incorporates herein Paragraphs 1 through 90 of this

17  Complaint.

18          92.    Defendants violated the rule of Nuremberg by engaging in a

19  common plan to attack another country. Defendants initiated this plan as early as

20  1998.

21          93.    Once in positions of power, Defendants attracted co-

22  conspirators in government to plan and commit the crime of aggression against

23  Iraq.

24          94.    Defendants violated the Kellogg-Briand Pact, a treaty signed in

25  1928, to which the United States is still a signatory. The Kellogg-Briand Pact

26  requires signatory nations such as the United States to "condemn recourse to war

27  for the solution of international controversies, and renounce it, as an instrument of

28  national policy in their relations with one another." The Kellogg-Briand Pact

                                18

1  requires signatory nations such as the United States to resolve all disputes or
2  conflicts through "pacific means." As a Treaty of the United States, the United
3  States Constitution incorporates this principle into its law under Article VI, clause
4  2, which declares "treaties made . . . to be the supreme law of the land."

5          95.    Defendants violated the United Nations Charter by planning to
6  commit the crime of aggression. Article II, Section 4 of the United Nations Charter
7  requires countries to "refrain in their international relations from the threat or use
8  of force against the territorial integrity or political independence of any state, or in
9  any other manner inconsistent with the Purposes of the United Nation." As a
10  Treaty of the United States, the United States Constitution incorporates this
11  principle into its law under Article VI, clause 2, which declares "treaties made . . .
12  to be the supreme law of the land."

13          96.    The crime of a conspiracy to wage an aggressive war is a
14  violation of international law that rests "on a norm of international character
15  accepted by the civilized world and defined with a specificity comparable to the
16  features of the 18th-century paradigms [the United States Supreme Court has]
17  recognized." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 725 (2004). Conspiracy to
18  engage in aggressive war was a chief crime prosecuted at Nuremberg, and that
19  Tribunal rejected Nazi attempts to claim vagueness with respect to the specific,
20  definitive, and obligatory nature of this crime.

21          97.    Plaintiff is aware of *Nixon v. Fitzgerald*, 457 U.S. 731 (1982) in
22  which the United States Supreme Court held in a 5-4 decision that the President of
23  the United States possesses immunity in civil court for actions taken pursuant to
24  his official duties as President. Plaintiff submits that *Nixon* is distinguishable in
25  that she alleges violations of accepted customary norms of international law.
26  Plaintiff submits that *Nixon* does not prohibit a cause of action against the
27  President or any other Executive official who engages in behavior considered
28  reprehensible in a civilized society, such as torture, crimes against humanity, or the

19

1   crime of aggression. To the extent that *Nixon* stands for the proposition that the
2   person holding the office of President cannot be held civilly liable for violations of
3   accepted customary norms of international law – such as torture, crimes against
4   humanity or the crime of aggression – then Plaintiff submits that *Nixon* is wrongly
5   decided and in direct contravention of accepted principles of the common law,
6   particularly the principle that rulers are "under God and the law."

7         98.   Defendants, by engaging in a conspiracy to commit the crime of
8   aggression, were the but-for and proximate cause of Plaintiff's damages (and
9   others like her) in the form of property loss, physical pain, shame, humiliation,
10   degradation and emotional stress, entitling her to damages in an amount to be
11   determined at trial.

12         99.   In light of Defendants' willful, knowing and intentional
13   violations of law against Plaintiff and others like her, and in light of their reckless
14   and callous indifference to the impact their actions would have on innocent Iraqi
15   civilians, their breach of international peace, their deception and fraud to the
16   democratic polity which elected them, and their reprehensible and cowardice use
17   of a terrorist attack to commit the crime of aggression against another a country
18   that posed no threat to the United States, endangering the United States armed
19   forces and millions of Iraqi civilians for their own malicious purposes, Plaintiff and
20   others like her seek an award of punitive and exemplary damages in an amount to
21   be determined at trial.

22                     **COUNT II**

23       **(The Crime of Aggression Against All Defendants)**

24         100.   Plaintiff incorporates herein Paragraphs 1 through 99 of this
25   Complaint.

26         101.   Defendants violated the rule of Nuremberg by attacking another
27   country without legal justification, and specifically, by committing the crime of
28   aggression against Iraq on March 19, 2003.

20

1           102.   Defendants violated the rule of Nuremberg by using fraudulent

2   and untrue statements in an attempt to convince diplomats, world leaders and the

3   American public that Iraq posed a threat to the United States and/or that Iraq was

4   in league with al-Qaeda, when neither of these things was true.

5           103.   Defendants violated the Kellogg-Briand Pact, a treaty signed in

6   1928, to which the United States is still a signatory. The Kellogg-Briand Pact

7   requires signatory nations such as the United States to "condemn recourse to war

8   for the solution of international controversies, and renounce it, as an instrument of

9   national policy in their relations with one another." The Kellogg-Briand Pact

10  requires signatory nations such as the United States to resolve all disputes or

11  conflicts through "pacific means." As a Treaty of the United States, the United

12  States Constitution incorporates this principle into its law under Article VI, clause

13  2, which declares "treaties made . . . to be the supreme law of the land."

14          104.   Defendants violated the United Nations Charter by engaging in

15  aggressive war. Article II, Section 4 of the United Nations Charter requires

16  countries to "refrain in their international relations from the threat or use of force

17  against the territorial integrity or political independence of any state, or in any

18  other manner inconsistent with the Purposes of the United Nation." As a Treaty of

19  the United States, the United States Constitution incorporates this principle into its

20  law under Article VI, clause 2, which declares "treaties made . . . to be the supreme

21  law of the land."

22          105.   The United Nations Charter also requires the United Nations

23  Security Council to authorize the use of force. No such authorization was ever

24  granted.

25          106.   The crime of aggression is a violation of international law that

26  rests "on a norm of international character accepted by the civilized world and

27  defined with a specificity comparable to the features of the 18th-century paradigms

28  [the United States Supreme Court has] recognized." *Sosa v. Alvarez-Machain*, 542

1 │ U.S. 692, 725 (2004). The crime of aggression was the chief crime prosecuted at

2 │ Nuremberg, and that Tribunal rejected Nazi attempts to claim vagueness with

3 │ respect to the specific, definitive, and obligatory nature of this crime.

4 │     107.   Plaintiff is aware of *Nixon v. Fitzgerald*, 457 U.S. 731 (1982) in

5 │ which the United States Supreme Court held in a 5-4 decision that the President of

6 │ the United States possesses immunity in civil court for actions taken pursuant to

7 │ his official duties as President. Plaintiff submits that *Nixon* is distinguishable in

8 │ that she alleges violations of accepted customary norms of international law.

9 │ Plaintiff submits that *Nixon* does not prohibit a cause of action against the

10 │ President or any other Executive official who engages in behavior considered

11 │ reprehensible in a civilized society, such as torture, crimes against humanity, or the

12 │ crime of aggression. To the extent that *Nixon* stands for the proposition that the

13 │ person holding the office of President cannot be held civilly liable for violations of

14 │ accepted customary norms of international law – such as torture, crimes against

15 │ humanity or the crime of aggression – then Plaintiff submits that *Nixon* is wrongly

16 │ decided and in direct contravention of accepted principles of the common law,

17 │ particularly the principle that rulers are "under God and the law."

18 │     108.   Defendants, by engaging in the crime of aggression, were the

19 │ but-for and proximate cause of Plaintiff's damages (and others like her) in the form

20 │ of property loss, physical pain, shame, humiliation, degradation and emotional

21 │ stress, entitling her to damages in an amount to be determined at trial.

22 │     109.   In light of Defendants' willful, knowing and intentional

23 │ violations of law against Plaintiff and others like her, and in light of their reckless

24 │ and callous indifference to the impact their actions would have on innocent Iraqi

25 │ civilians, their breach of international peace, their deception and fraud to the

26 │ democratic polity which elected them, and their reprehensible and cowardice use

27 │ of a terrorist attack to commit the crime of aggression against another a country

28 │ that posed no threat to the United States, endangering the United States armed

COMAR LAW

COMPLAINT FOR CONSPIRACY TO COMMIT AGGRESSION;
AND THE CRIME OF AGGRESSION

1  forces and millions of Iraqi civilians for their own malicious purposes, Plaintiff and
2  others like her seek an award of punitive and exemplary damages in an amount to
3  be determined at trial.

4  ## PRAYER FOR RELIEF

5  **WHEREFORE,** Plaintiff prays for judgment against Defendants on
6  all alleged claims, as follows:

7  1.  For an order finding that Defendants planned and committed
8  the crime of aggression.

9  2.  For an award of compensatory damages against Defendants in
10  an amount sufficient to compensate Plaintiff and all members of the Iraq Civilian
11  Victims' Class for damages they sustained as a result of Defendants' illegal actions
12  in planning and mounting a war of aggression against Iraq.

13  3.  To the extent that Defendants' assets do not cover damages of
14  the Iraq Civilian Victims' Class, that Defendants set up, manage and obtain other
15  funding at their expense a restitution fund to provide for proper compensation to
16  any and all Iraqi civilians who were damaged because of Defendants' commission
17  of the crime of aggression against Iraq.

18  4.  For an award of exemplary and punitive damages against
19  Defendants in an amount sufficient to punish and set an example of them in their
20  unconscionable conduct in planning and committing the crime of aggression
21  against another country.

22  5.  For an order awarding Plaintiff's costs of suit, including
23  litigation expenses (such as costs for depositions and experts), photocopying
24  expenses, and filing fees in an amount which this Court deems just, equitable and
25  proper. Counsel for Plaintiff has no financial interest tied to the outcome of this
26  litigation and is not charging fees for representing the Plaintiff and the proposed
27  class.

28  6.  Such other and further relief as the Court deems just, equitable

23

COMPLAINT FOR CONSPIRACY TO COMMIT AGGRESSION;
AND THE CRIME OF AGGRESSION

1    and proper.

2                   **TRIAL BY JURY DEMANDED**

3            Pursuant to Federal Rule of Civil Procedure 38 and Civil Local Rule

4    3-6, Plaintiff hereby demands a jury trial on all issues so triable.

5

6    Dated: March 13, 2013              COMAR LAW

7

8                             By

9                                D. Inder Comar
                               *Attorney for Plaintiff*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

24

          COMPLAINT FOR CONSPIRACY TO COMMIT AGGRESSION;
AND THE CRIME OF AGGRESSION